UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ELECTRONIC PUBLICATION ONLY

ANDREW APPLE, PASCAL ARMSTRONG, MAURICE GRIFFIN, KATHLEEN NOREIGA, KIMRON PRIME, JONATHAN SILVA, and CLARENCE STEWART,

                      Plaintiffs,

- versus -

ATLANTIC YARDS DEVELOPMENT COMPANY, LLC, BROOKLYN ARENA LLC, BROOKLYN UNITED FOR INNOVATIVE LOCAL DEVELOPMENT, JAMES CALDWELL, FOREST CITY RATNER COMPANIES, LLC, FOREST CITY ENTERPRISES, INC., GAUSIA JONES, JANE MARSHALL, ORBIN'S BIG BREEN MACHINE, and BRUCE RATNER,

                      Defendants.

MEMORANDUM AND ORDER

11-CV-5550 (JG) (JMA)

A P P E A R A N C E S :

    EMERY CELLI BRINCKERHOFF & ABADY LLP
        75 Rockefeller Plaza
        20th Floor
        New York, New York 10019
    By:   Matthew D. Brinckerhoff
           - *and* -
    SOUTH BROOKLYN LEGAL SERVICES
        105 Court Street
        3rd Floor
        Brooklyn, New York 11201
    By:   John C. Gray
           Sarah E. Dranoff
           Nicole Salk
           Gary Steven Stone

    *Attorneys for Plaintiffs*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
    1177 Avenue of the Americas
    New York, New York 10036
By: Harold P. Weinberger
    Robert N. Holtzman
    Eileen M. Patt

    *Attorneys for Defendants Atlantic Yards
    Development Company, LLC, Brooklyn Arena,
    LLC, Brooklyn United for Innovative Local
    Development, James Caldwell, Forest City Ratner
    Companies, LLC, Forest City Enterprises, Inc.,
    Jane Marshall and Bruce Ratner*

SHER TREMONTE LLP
    41 Madison Avenue
    41st Floor
    New York, New York 10010
By: Michael Tremonte
    Justin M. Sher

    *Attorneys for Defendants Gausia Jones and
    Orbin's Big Green Machine*

JOHN GLEESON, United States District Judge:

Plaintiffs Andrew Apple, Pascal Armstrong, Maurice Griffin, Kathleen Noreiga, Kimron Prime, Jonathan Silva and Clarence Stewart bring this action asserting various claims arising from their participation in what they allege was represented to be an employment training program. They allege that in exchange for their participation in the program, they were promised membership in a labor union and construction jobs at the Atlantic Yards construction project in Brooklyn, New York. They further allege that even though they completed the program and provided two months of unpaid construction work, the promised union membership and jobs were not provided. They have asserted claims against Atlantic Yards Development Company, LLC ("Atlantic Yards Co."), Brooklyn Arena LLC ("Brooklyn Arena"), Forest City Ratner Companies, LLC ("FCRC"), Forest City Enterprises, Inc. ("FCE"), Jane Marshall and Bruce Ratner (collectively, the "Forest City Defendants"); Brooklyn United for Innovative Local

2

Development ("BUILD") and James Caldwell (collectively, the "BUILD Defendants"); and Gausia Jones and Orbin's Big Green Machine (collectively, the "Jones Defendants").

The Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss some of the claims for failure to state a claim. For the reasons set forth below, the Defendants' partial motions to dismiss are granted in part and denied in part.

BACKGROUND

A. *Factual Background*

The Forest City Defendants are developing the Atlantic Yards project, a major real estate development project in Brooklyn, New York. *See* Compl. ¶¶ 33–34, ECF No. 1.[1] It includes commercial and residential buildings as well as an arena that will be the home of the Brooklyn Nets professional basketball team. *Id.* ¶ 34.

The Atlantic Yards project provoked opposition from many residents of the surrounding community. *Id.* ¶ 35. To assuage these concerns, the Forest City Defendants promised that the project would bring thousands of permanent jobs as well as 17,000 construction jobs to the area. *Id.* ¶ 36.

The Forest City Defendants also promised to provide certain benefits to the community in an agreement called the Community Benefits Agreement (the "CBA"). The parties to the CBA included Atlantic Yards Co., Brooklyn Arena and several organizations that were created after the Atlantic Yards project was announced and that received some or all of their funding from the Forest City Defendants. *Id.* ¶ 37. Among these organizations was BUILD. *Id.* BUILD receives both significant funding and office space from FCRC and related

---

[1] The facts are drawn from the complaint and are assumed to be true for purposes of these motions.

3

entities. *See id.* ¶¶ 49–50. BUILD "was essentially created to see the [Atlantic Yards project] into fruition." *Id.* ¶ 53.

Among the promises in the CBA is the creation of a program to train community residents for construction jobs at the Atlantic Yards project, known as the pre-apprenticeship training program (the "PATP"). *Id.* ¶ 39. The parties to the CBA agreed to jointly initiate and coordinate the PATP, to make every effort to enroll community residents, and to secure funding for the program. *See id.* Atlantic Yards Co. and Brooklyn Arena also agreed to find suitable space to house the PATP. *See id.* ¶ 40.

The goal of the PATP was to obtain union memberships and jobs for its participants. The CBA states that Atlantic Yards Co. and Brooklyn Arena intend that the NYC Building Trades Council "will accept workers from the [PATP] into [its] apprentice program." *Id.* ¶ 46 (internal quotation marks omitted).

BUILD began recruiting participants for the PATP in July 2010. *Id.* ¶ 54. At an information session on August 4, 2010, hundreds of potential participants attended, including some of the Plaintiffs. *Id.* ¶ 55. Those who passed an aptitude test were invited to an orientation session. *Id.* ¶¶ 55–56. Most of the Plaintiffs also attended the orientation session. *Id.* ¶ 56.

At the orientation, Caldwell, the Chief Executive Officer of BUILD, told attendees that everyone who completed the PATP would get a job at the Atlantic Yards construction site and membership in one of the primary unions at the site – the unions for laborers, electricians and carpenters. *Id.* Caldwell told the attendees to "prepare to be millionaires." *Id.* Caldwell assured one of the Plaintiffs that he would not have to apply to a union because "[t]here are thirty construction books reserved for graduates of this class." *Id.* ¶ 57. Marshall, a senior executive of FCE and FCRC, told attendees that they would have

construction work for ten years and that PATP participants would receive union membership. *See id.* ¶ 59.

In reliance on these and other statements, the Plaintiffs decided to participate in the PATP. *See id.* ¶¶ 60–61, 63–64. Several of them quit their jobs or turned down job offers in order to do so, relying on the promise of union memberships and high-paid construction jobs. *See id.* ¶ 61.

The PATP commenced with classroom sessions. *See id.* ¶ 65. Participants received instructional materials, but these were "not sufficiently detailed to provide participants with new skills or knowledge." *Id.* ¶ 66. They were required to have certain equipment, which they acquired at their own expense. *See id.* ¶ 68.

During the first month of the program, Caldwell told participants that Ratner was working to identify a site for them to receive hands-on training. *See id.* ¶ 70. Caldwell also told them that he was waiting for the Forest City Defendants to provide the necessary funding for this hands-on training. *See id.*

During the course of the PATP, Caldwell and others continued to promise participants that they would receive union memberships at the end of the program. *See id.* ¶ 71. He even told them that the union memberships had already been obtained. *See id.* ¶ 72. Jones, one of the PATP instructors, told participants "that he had seen the union cards and that they were ready to be given away upon completion of the PATP." *Id.* ¶ 74.

Jones's company, Orbin's Big Green Machine, provided a worksite at which PATP participants were to receive the promised hand-on training. *See id.* ¶ 76. Caldwell told one of the Plaintiffs that Ratner had personally approved this site. *See id.* The worksite was a residential house on Staten Island that was being remodeled by Jones's company. *Id.*

5

The PATP participants were the only workers at the site. *Id.* They were responsible for all the work, including heavy labor and demolition. *Id.* ¶ 79. The participants received little actual training and, to the extent they did receive training, they were taught improper methods. *See id.* ¶¶ 80, 82; *see also id.* ¶ 78. PATP participants were told that working at the Staten Island site was a requirement for completion of the program and receipt of the promised union cards. *See id.* ¶ 83.

PATP participants worked at the Staten Island site for approximately two months and were paid nothing. *See id.* ¶ 84. By the seventh or eighth week, they were provided with MetroCards by BUILD for their transportation. *See id.* The funding for the MetroCards (as well as other PATP expenses) came from the Forest City Defendants. *See id.*

After completing the program, none of the Plaintiffs received union memberships or construction jobs at the Atlantic Yards construction site. *See id.* ¶¶ 87–97. Two of the Plaintiffs did obtain union memberships, but they did so on their own without any assistance from BUILD. *See id.* ¶ 87.

B.   *Procedural Background*

The Plaintiffs commenced this action on November 15, 2011. Their complaint asserts the following claims: (1) failure to pay the federal minimum wage in violation of the Fair Labor Standards Act (the "FLSA"); (2) failure to pay the New York minimum wage in violation of the New York Labor Law (the "NYLL"); (3) fraudulent inducement; (4) deceptive practices in violation of § 349 of the New York General Business Law; (5) breach of contract; (6) breach of unilateral contract; (7) promissory estoppel; and (8) unjust enrichment.

On February 15, 2012, the Defendants filed partial motions to dismiss the complaint for failure to state a claim. The Defendants seek dismissal of the following claims:

6

(1) the § 349 claim; (2) the breach of contract claims against Caldwell, Ratner, Marshall and the Jones Defendants; (3) the promissory estoppel claim; (4) the fraudulent inducement claim; (5) the unjust enrichment claim against the Forest City and BUILD Defendants; and (6) the FLSA and NYLL claims against the Forest City and BUILD Defendants.

DISCUSSION

A.   *Standard of Review*

To survive a motion to dismiss, a complaint must allege sufficient facts to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 173 (2d Cir. 2012). In making this determination, a court should assume all well-pleaded allegations in the complaint to be true "and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950.

B.   *Analysis*

   1.   *The Deceptive Business Practices Claim*

Section 349 of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). It authorizes a private cause of action to anyone injured by a violation of this prohibition. *See id.* § 349(h).

Although the statute does not use the word "consumer," the New York Court of Appeals has held, based on the legislative history, that "plaintiffs claiming the benefit of section 349 . . . must charge conduct of the defendant that is consumer-oriented." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995); *see also Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007). "Consumer-oriented conduct does not require a repetition or pattern of deceptive behavior." *Oswego Laborers' Local*

7

*214 Pension Fund*, 647 N.E.2d at 744. Rather, a plaintiff "must demonstrate that the acts or practices have a broader impact on consumers at large. Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute." *Id.*; *see also Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64–65 (2d Cir. 2010).

The Defendants argue that deceptive practices in the context of employment are not consumer oriented. The Defendants' position is that a practice is consumer oriented only if it involves individuals purchasing goods or services. Some decisions appear to support this narrow view. *See, e.g.*, *Grasso v. Chase Manhattan Bank*, No. 01-CV-4371 (AKH), 2002 WL 575667, at *5 (S.D.N.Y. Apr. 17, 2002) (allegedly false advertisements seeking prospective employment applicants were not consumer oriented); *Carrabus v. Schneider*, 119 F. Supp. 2d 221, 232 (E.D.N.Y. 2000) ("Because plaintiffs do not allege that the County has sold plaintiffs any goods or services . . ., their claim under [§ 349] must fail."), *aff'd*, 13 F. App'x 33 (2d Cir. 2001).

The Plaintiffs disagree. They argue that "consumer-oriented" is essentially equivalent to "public oriented." Thus, they assert that as long as a deceptive practice has some impact on members of the public at large, it is within the scope of § 349.

Some cases support the Plaintiffs' view that a case is sufficiently consumer-oriented if it involves a matter that "affects the public interest." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995). This view garners additional support from the fact that the Court of Appeals distinguished consumer-oriented cases from those involving mere "[p]rivate contract disputes, unique to the parties." *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 744. It did not draw a distinction between cases involving markets for goods and services and those involving other markets, such as labor or real estate. *Cf. Sheehy v. New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 74 (E.D.N.Y. 2010) (noting that courts have applied
8

§ 349 to real estate transactions if the "defendant published advertisements or otherwise solicited the general public").

Thus, I see no reason to hold categorically that § 349 does not apply in the employment context. The consumer-oriented requirement exists to prevent plaintiffs from turning private contract disputes into claims of deceptive practices. Applying that principle in the context of employment, a deceptive practice violates § 349 if it is broadly used to solicit potential employees. On the other hand, § 349 does not apply to negotiated employment contracts that are unique to a particular set of parties.

The facts alleged here are that the Defendants recruited a large number of potential trainees with allegedly misleading promises of union membership and jobs. This constitutes a sufficient public impact to satisfy the consumer-orientation prong of § 349.

In addition, § 349 would apply in this case even under the Defendants' interpretation of the consumer-orientation requirement. The Plaintiffs were not strictly employees in the traditional sense, but consumers of a training program offered by the Defendants.[2] New York courts have applied § 349 to claims brought by consumers of educational or vocational training programs. *See, e.g.*, *Enzinna v. D'Youville Coll.*, 922 N.Y.S.2d 729, 730 (App. Div. 4th Dep't 2011) (students who enrolled in chiropractic training program had § 349 claim arising from false statement in promotional catalog). Here, the Plaintiffs provided their time and labor, rather than their money, in exchange for training. But they are consumers of a training program nonetheless.

Accordingly, the motion to dismiss the Plaintiffs' § 349 claim is denied.

---

[2] Although the Defendants argue there is some inconsistency between the Plaintiffs' claims that they were employees for purposes of the FLSA and trainees for purposes of § 349, I do not believe these are mutually exclusive categories under the facts of this case.

9

## 2. *The Promissory Estoppel Claim*

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000). The Defendants argue that the Plaintiffs have failed to sufficiently allege the first two elements.

The Defendants focus on language in the CBA that purports to limit its binding effect. The CBA provides that it does not confer "any rights or remedies" on third parties. CBA § XIV.H. It also provides that the Forest City and BUILD Defendants merely "intend to negotiate" with the relevant union and that it is their "intention" that the union will accept PATP participants. *Id.* § IV.B.2. The Defendants argue that, in light of this language, the CBA cannot be deemed to contain any clear and unambiguous promises to the Plaintiffs, and that the Plaintiffs could not have reasonably relied on any promises it contains.

This argument fails because the Plaintiffs' promissory estoppel claim is not based on any promises made in the CBA, but rather on alleged oral promises that PATP participants would receive jobs and union membership. *See* Compl. ¶¶ 56–57, 59, 71–72. For example, Caldwell allegedly told one of the Plaintiffs, "you do not have to apply to a union. There are thirty construction books reserved for graduates of this class." *Id.* ¶ 57. I conclude that these alleged statements constitute clear and unambiguous promises.

The Defendants argue that any reliance on these statements was unreasonable because it was ultimately up to the union to determine who would be offered membership. However, I cannot conclude at the pleadings stage that it was unreasonable, as a matter of law, for the Plaintiffs to rely on promises of union membership and jobs made to a small number of

10

PATP participants by a major real estate enterprise that would employ tens of thousands of union workers.

The Defendants also argue that the promissory estoppel claim should be dismissed because it is duplicative of the Plaintiffs' breach of contract claim. At the pleadings stage, however, the Plaintiffs are entitled to pursue alternative theories. *See Sabilia v. Richmond*, No. 11-CV-739 (JPO) (MHD), 2011 WL 7091353, at *27 (S.D.N.Y. Oct. 26, 2011), *report and recommendation adopted by* 2012 WL 213656 (S.D.N.Y. Jan. 24, 2012); *Air Italy S.p.A. v. Aviation Techs., Inc.*, No. 10-CV-20 (JG)(JMA), 2010 WL 2925949, at *5 (E.D.N.Y. July 21, 2010); *Global Crossing Bandwidth, Inc. v. PNG Telecomms., Inc.*, No. 06-CV-6415T, 2007 WL 174094, at *3 (W.D.N.Y. Jan. 22, 2007). In the event the Plaintiffs cannot establish the existence of an enforceable contract, they may then be able to recover on their promissory estoppel claim. Of course, they cannot obtain a duplicative recovery, but that can be addressed at a later stage of the case, if necessary.

I agree with the Defendants, however, that the promissory estoppel claim must be dismissed with respect to Ratner, as there are no allegations that he made any of the statements on which the Plaintiffs allege they relied. It must also be dismissed with respect to the Jones Defendants, as the only promissory statement allegedly made by Jones occurred after the Plaintiffs had already enrolled in the PATP and thus there are no allegations that they relied on his statement. Accordingly, the Defendants' motion to dismiss the promissory estoppel claim is granted with respect to Ratner and the Jones Defendants and otherwise denied.

3. *The Fraudulent Inducement Claim*

   a. *Contracting Parties*

Courts are wary of allowing plaintiffs to turn a simple breach of contract into a claim for fraud, thereby raising the specter of punitive damages. Accordingly, "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (quoting *Sudul v. Computer Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994)) (internal quotation marks omitted). However, a parallel fraud claim may be brought for "a fraudulent misrepresentation that is collateral or extraneous to the contract." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007). "[A] misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty." *Id.* at 184 (quoting *First Bank of Ams. v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 21 (App. Div. 1st Dep't 1999)) (internal quotation marks omitted) (alteration in original).

In the context of this case, there can be no fraud claim to the extent any contracting party promised to provide union membership and jobs, as any such statement would be a "promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action." *Id.* However, a fraudulent inducement claim would potentially be available for statements that union slots had already been reserved for PATP participants, as that would be a misrepresentation of present fact. *See id.*

Upon reviewing the complaint, however, it appears that the only alleged statements that could be regarded as misrepresentations of present fact, *i.e.*, that the union

12

memberships for PATP participants had already been secured, were not made until *after* the Plaintiffs had enrolled in the PATP. The complaint does not allege that any of the Plaintiffs relied on such statements by, for example, remaining in the PATP instead of dropping out.[3] Accordingly, the fraudulent inducement claim against the Defendants must be dismissed to the extent that they were parties to a contract with the Plaintiffs.

    b.  *Non-Contracting Parties*

The rule that a plaintiff may not base a fraud claim on a breach of contract has no application to anyone who is not a party to the relevant contract. Thus, a plaintiff may assert a fraudulent inducement claim against a non-contracting party arising from misrepresentations that induce the plaintiff to enter into a contract. *See LIUS Grp. Int'l Endwell, LLC v. HFS Int'l, Inc.*, 939 N.Y.S.2d 525, 527 (App. Div. 2d Dep't 2012); *Selinger Enters., Inc. v. Cassuto*, 860 N.Y.S.2d 533, 536 (App. Div. 2d Dep't 2008); *La Barte v. Seneca Res. Corp.*, 728 N.Y.S.2d 618, 621 (App. Div. 4th Dep't 2001); *see also Sun Prods. Corp. v. Bruch*, No. 10-CV-4816 (SAS), 2011 WL 5120307, at *5 (S.D.N.Y. Oct. 28, 2011) ("While Bruch is correct that a party is generally barred from suing in fraud when the identical allegations support a breach of contract, that defense is inapplicable where, as here, Bruch was not a party to the contract."); *Jordan (Berm.) Inv. Co. v. Hunter Green Invs. Ltd.*, No. 00-CV-9214 (RWS), 2003 WL 1751780, at *8 (S.D.N.Y. Apr. 1, 2003). For example, a plaintiff who is induced to enter into a contract with a company due to fraudulent misrepresentations by that company's president may assert a fraudulent inducement claim against the president. *See, e.g.*, *LIUS Grp. Int'l Endwell*, 939 N.Y.S.2d at 527.

---

[3]  The complaint does allege that one of the Plaintiffs turned down an invitation to attend an orientation for the laborers' union in reliance on a promise by a BUILD employee that he would receive a union card through the PATP. *See* Compl. ¶ 73. But that reliance involved a promise, not a statement of present fact.

The Plaintiffs are not pressing contract claims against Ratner, Caldwell, Marshall or the Jones Defendants.[4] Thus, the existence of a contract claim does not bar the Plaintiffs from pressing a fraudulent inducement claim against these Defendants. However, since Ratner is not alleged to have made any of the misrepresentations at issue, there can be no fraudulent inducement claim against him.

As to the others, the Plaintiffs must do more than merely allege that these Defendants promised them union jobs that they did not receive. They must also allege that they acted with the requisite scienter. *See, e.g.*, *Meadows v. Planet Aid, Inc.*, 676 F. Supp. 2d 83, 99 n.2 (E.D.N.Y. 2009). Under New York law, that includes both intent to deceive and reckless indifference to the truth. *See E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 289 n.3 (S.D.N.Y. 2006). Thus, the Defendants can be liable for fraudulent inducement only if they promised the Plaintiffs union jobs when they knew, or were recklessly indifferent as to whether, there would be no such jobs for them.

Under Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff asserting a fraud claim must allege facts giving rise to a strong inference of scienter. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004). This may be done "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (internal quotation marks and citations omitted). Conclusory allegations of fraudulent intent will not suffice. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

---

[4] As explained below, the complaint asserts breach of contract claims against all the Defendants, but the Plaintiffs have abandoned those claims against Ratner, Caldwell, Marshall and the Jones Defendants.

14

The complaint is devoid of non-conclusory allegations regarding intent. While the facts alleged show that the Defendants were wrong about PATP participants getting union jobs, the allegations do not support a strong inference of scienter. The Defendants may have thought PATP participants would get union jobs and been wrong about it.

The Plaintiffs argue that Caldwell had a motive to commit fraud to generally support the goals of BUILD and the Atlantic Yards project. But this kind of generalized motive is not sufficiently concrete to support a strong inference of scienter. *See, e.g.*, *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996). They also argue that Caldwell was recklessly indifferent as to whether PATP participants would actually get union jobs since the Defendants now argue this was out of their control. But Caldwell could still have genuinely and reasonably believed that the unions *would* give memberships to PATP participants.

Accordingly, since the Plaintiffs have failed to allege facts that give rise to a strong inference of scienter, the fraudulent inducement claim is dismissed.[5]

4.  *The Breach of Contract and Unjust Enrichment Claims*

The Defendants moved to dismiss the breach of contract claims against Ratner, Caldwell, Marshall and the Jones Defendants as well as the unjust enrichment claim against the Forest City and BUILD Defendants. The Plaintiffs' opposition papers do not address these aspects of the Defendants' motions. Accordingly, these claims are deemed abandoned and are dismissed. *See, e.g.*, *Ret. Bd. of Policemen's Annuity & Ben. Fund of Chi. v. Bank of N.Y. Mellon*, No. 11-CV-5459 (WHP), 2012 WL 1108533, at *8 (S.D.N.Y. Apr. 3, 2012); *Pibouin v. CA, Inc.*, No. 09-CV-3336 (DRH) (AKT), 2012 WL 1118629, at *9 (E.D.N.Y. Mar. 31, 2012);

---

[5] The fraudulent inducement claim against the Jones Defendants must also be dismissed due to the lack of allegations of reliance on the alleged misrepresentation made by Jones.

*Lipton v. Cnty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

    5.    *The FLSA and NYLL Claims*

The FLSA applies to an "employer," which includes those "acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); *see also Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 140 (2d Cir. 2008). The FLSA's broad definitions "'cover some parties who might not qualify as [employees] under a strict application of traditional agency law principles,' in order to effectuate the remedial purposes of the act." *Barfield*, 537 F.3d at 141 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).

Both federal regulations and Second Circuit precedent "recognize the possibility of joint employment for purposes of determining FLSA responsibilities." *Id.*; *see also* 29 C.F.R. § 791.2(a). Although the BUILD Defendants and the Jones Defendants do not dispute their status as joint employers of the Plaintiffs for purposes of this motion, the Forest City Defendants do.

The Supreme Court adopted an "economic reality" test for determining who qualifies as an employer under the FLSA.[6] *See Barfield*, 537 F.3d at 141 (citing *Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33 (1961)). Rather than a single test, however, the economic reality test has involved "different sets of relevant factors based on the factual challenges posed by particular cases." *Id.* at 142. Different decisions have identified different

---

[6] Courts generally regard employer status under the NYLL to be identical to that under the FLSA. *See, e.g.*, *Wilk v. VIP Health Care Servs., Inc.*, No. 10-CV-5530 (ILG) (JMA), 2012 WL 560738, at *6 n.9 (E.D.N.Y. Feb. 21, 2012). The parties do not identify any distinctions between the two statutes bearing on this motion. I will therefore not address the NYLL separately.

16

factors, while emphasizing that those factors were not exhaustive. *See id.* at 142–43. Ultimately, "employment for FLSA purposes [is] a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Id.* at 141–42.

This case is somewhat unusual, since the Plaintiffs were not employees in the ordinary sense of the term. They were, rather, participants in a training program who ended up providing two months of unpaid labor. Thus, many of the factors traditionally applied in identifying employers, such as maintenance of employment records or control over rate and method of payment, *see id.* at 142, are difficult to import into this case.

The Department of Labor's regulations regarding joint employment provide additional guidance. They identify some situations where "a joint employment relationship generally will be considered to exist." 29 C.F.R. § 791.2(b). These situations are:

> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
>
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*Id.* (footnotes omitted).[7]

The Plaintiffs have adequately alleged that the PATP was a joint enterprise of BUILD and the Forest City Defendants.[8] The CBA provides that the "*Developers and* BUILD

---

[7] The parties dispute the whether the regulation is controlling. While the Plaintiffs claim the regulation is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Defendants argue that the traditional economic reality test must govern. I need not resolve this dispute, because even if the Plaintiffs' allegations are under the economic reality test, the Forest City Defendants qualify as joint employers.

17

shall initiate and coordinate a job training program" – the PATP. CBA § IV.B.1.a (emphasis added).[9] They jointly endeavored to enroll PATP participants, find suitable space to operate the program, and obtain funding for it. *Id.* In addition, the Forest City Defendants actually funded the PATP and provided its facilities. Given the terms of the CBA, I conclude that the Plaintiffs have sufficiently alleged that the Forest City Defendants were their joint employers under the FLSA.

The same conclusion applies to the individual Forest City Defendants, Ratner and Marshall. "[I]ndividual officers, directors, and executives of an entity may constitute 'employers' of an employee if they 'possessed the power to control' him or her." *Wilk v. VIP Health Care Servs., Inc.*, No. 10-CV-5530 (ILG) (JMA), 2012 WL 560738, at *7 (E.D.N.Y. Feb. 21, 2012). "[T]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Id.* (internal quotation marks and citations omitted); *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 140 (2d Cir. 1999).

Ratner is the head of the Forest City enterprise and a signatory to the CBA. Compl. ¶¶ 23, 38. He regularly conferred with Caldwell regarding the PATP and was involved in selecting the Staten Island worksite where the Plaintiffs labored for two months without receiving payment or actual training. *See, e.g.*, *id.* ¶¶ 70, 72, 76. Marshall was also a senior executive who was closely involved in the PATP. *See, e.g.*, *id.* ¶¶ 21, 59, 97. While Ratner and

---

[8] That distinguishes this case from *Diaz v. Consortium for Worker Education, Inc.*, No. 10-CV-1848 (LAP), 2010 WL 3910280 (S.D.N.Y. Sept. 28, 2010), cited by the Defendants, which held that allegations that the defendant provided funding for a program administered by two entities and that they "shared a common goal" did not make that defendant an employer of the program's employees under the FLSA. *See id.* at *3.

[9] The term "Developers" in the CBA includes only Atlantic Yards and Brooklyn Arena, not the other Forest City entities. CBA p.1. However, the Defendants do not distinguish among the different companies in any meaningful way. Therefore, for purposes of this motion, I shall treat all the Forest City companies as parties to the CBA.

Marshall are not alleged to have played a role in the day-to-day administration of the PATP, they exercised operational control. This is sufficient to allege their status as joint employers. *See Ahn v. Inkwell Publ'g Solutions, Inc.*, No. 10-CV-8726 (KNF), 2012 WL 1059679, at *1 (S.D.N.Y. Mar. 29, 2012) ("An owner need not exercise direct control over an employee to be considered an employer under the FLSA[;] having operational control over the corporation is sufficient."); *see also Herman*, 172 F.3d at 140.

## CONCLUSION

For the reasons stated above, the Defendants' partial motions to dismiss are granted with respect to (a) the fraudulent inducement claim; (b) the promissory estoppel claim against Ratner and the Jones Defendants; (c) the breach of contract claims against Ratner, Caldwell, Marshall and the Jones Defendants; and (d) the unjust enrichment claim against the Forest City and BUILD Defendants. The motions are otherwise denied.

So ordered.

John Gleeson, U.S.D.J.

Dated: June 18, 2012
      Brooklyn, New York