UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANDREW APPLE; PASCAL ARMSTRONG;
ELGIN BECKFORD; EMERIE BECKFORD;
SEWAYNE DALEY; MAURICE GRIFFIN;
JEANETTE HENRIQUES; ALFONZA LEWIS;
LLOYD BERNARD MATTHEWS; CAROL
NEILS; KATHLEEN NOREIGA; ALONZO
PHILLIPS; KIMRON PRIME; WAYNE ST.
LOUIS; JONATHAN SILVA; ANDRE SMALL;
CLARENCE STEWART; JAY WHITLEY;
JEFFREY WILLIAMS; and DEVIN WRIGHT,

                    Plaintiffs,

v.

ATLANTIC YARDS DEVELOPMENT
COMPANY, LLC; BROOKLYN ARENA LLC;
BROOKLYN UNITED FOR INNOVATIVE
LOCAL DEVELOPMENT; JAMES
CALDWELL; FOREST CITY RATNER
COMPANIES, LLC; FOREST CITY
ENTERPRISES, INC.; GAUSIA JONES; JANE
MARSHALL; ORBIN'S BIG GREEN
MACHINE; and BRUCE RATNER,

                    Defendants.

11 Civ. 5550 (JG)(JA)

**AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

### PRELIMINARY STATEMENT

1.     Plaintiffs, on behalf of themselves and others similarly situated under 29

U.S.C. § 216(b), bring this action to recover unpaid wages for work performed for

Defendants.  Plaintiffs also bring this action to recover damages based on broken promises

made by Defendants to induce Plaintiffs to participate in a sham employment training

program.

2.     For roughly two months Plaintiffs were employed by Defendants in the

construction of a house in Staten Island, yet they received no wages or other compensation

1

for their work. Although the work was performed under the aegis of what Defendants called a "Pre-Apprenticeship Training Program" ("PATP"), as Defendants knew, Plaintiffs were already fully capable of performing construction work, and, in fact, most of the Plaintiffs already had extensive training and/or experience in construction work. The sole inducement for Plaintiffs' work was Defendants' unequivocal and repeated promise that if Plaintiffs performed the work as directed and otherwise fulfilled all requirements of the PATP, each would be provided membership in building trades unions whose workers would be employed in the Atlantic Yards Project. Despite Plaintiffs' full performance of all requirements of the PATP, however, Defendants failed to provide the promised union memberships.

3.    Defendants are therefore liable to Plaintiffs for unpaid wages for the work they performed. Defendants are also liable for damages arising from their failure to fulfill their promises to arrange for issuance of union cards or to provide access to any comparable employment opportunities. Plaintiffs bring this action under the minimum wage provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206, and New York Labor Law § 652, the anti-deceptive practices provisions of New York General Business Law § 349, and for breach of contract.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 for civil actions arising under the laws of the United States. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants recruited, hired, and employed Plaintiffs in this District.

## PARTIES

### Plaintiffs

6.   Plaintiffs are individuals who have suffered damages as a consequence of having enrolled in and completed Defendants' PATP without compensation ("FLSA Plaintiffs"). The FLSA Plaintiffs include (1) the seven Plaintiffs named in the original Complaint named and described in paragraphs 8 through 14, *infra*, and (2) thirteen additional Plaintiffs, all individuals who consented to having their rights adjudicated under the collective action. The additional FLSA Plaintiffs are Elgin Beckford, Emerie Beckford, Sewayne Daley, Jeanette Henriques, Alfonza Lewis, Lloyd Bernard Matthews, Carol Neils, Alonzo Phillips, Wayne St. Louis, Andre Small, Jay Whitley, Jeffrey Williams, and Devin Wright.

7.   Plaintiffs have suffered damages as a consequence of having been induced to enroll in and complete the PATP by unequivocal and repeated promises that if they performed the work as directed and otherwise fulfilled all requirements of the PATP, each would be provided membership in building trades unions whose workers would be employed in the Atlantic Yards Project. Despite Plaintiffs' full performance of all requirements of the PATP, however, Defendants failed to provide the promised union memberships. Plaintiffs include (1) the seven Plaintiffs named in the original Complaint named and described in paragraphs 8 through 14, *infra*, and (2) twelve additional Plaintiffs, all individuals who consented to having their rights adjudicated under the collective action, and who now, by this Amended Complaint, assert all claims set forth herein. The additional Plaintiffs are Elgin Beckford, Emerie Beckford, Sewayne Daley,

Jeanette Henriques, Lloyd Bernard Matthews, Carol Neils, Alonzo Phillips, Wayne St. Louis, Andre Small, Jay Whitley, Jeffrey Williams, and Devin Wright.

8. Plaintiff Andrew Apple is twenty-five years old and a resident of Brooklyn.  Mr. Apple is African-American.  Mr. Apple participated in the PATP.  Prior to his participation in the PATP, Mr. Apple had already worked as a carpenter for approximately six to eight months.

9.    Plaintiff Pascal Armstrong is thirty years old.  Mr. Armstrong is African-American.  Mr. Armstrong participated in the PATP.  Mr. Armstrong has resided in Brooklyn since 1991.  Prior to his participation in the PATP, Mr. Armstrong already had extensive experience in the construction industry, including being the foreman of a 100-worker crew.

10.    Plaintiff Maurice Griffin is twenty-five years old.  Mr. Griffin was born in Brooklyn and is a resident of Brooklyn.  Mr. Griffin is biracial.  Mr. Griffin participated in the PATP.  Prior to his participation in the PATP, Mr. Griffin had graduated from a vocational program in carpentry, and had worked as a carpenter for at least three years.  Mr. Griffin decided to quit his carpentry work in order to participate in the PATP, based on the promises of union membership.

11.    Plaintiff Kathleen Noreiga is fifty-nineyears old and a resident of Brooklyn.  Ms. Noreiga has lived in Brooklyn since she moved to the United States at age eighteen.  Ms. Noreiga is Caribbean-American.  Ms. Noreiga participated in the PATP.  Prior to her participation in the PATP, Ms. Noreiga had received 600 hours of training for certification as an electrician, and had worked for more than a year as a certified electrician.

12.     Plaintiff Kimron Prime is twenty-eight years old and has been a resident of Brooklyn since 2005.  Mr. Prime is Caribbean-American.  Mr. Prime participated in the PATP.  Prior to his participation in the PATP, Mr. Prime attended a trade school where he learned basic electrical and plumbing work, and had work experience in bricklaying and carpentry.

13.     Plaintiff Jonathan Silva is thirty-seven years old and a resident of Brooklyn.  Mr. Silva is African-American.  Mr. Silva participated in the PATP.  Mr. Silva worked as an apprentice to an electrician for three years.

14.     Plaintiff Clarence Stewart is forty-seven years old and a resident of Burlington Township, New Jersey.  Mr. Stewart was born in Brooklyn, New York and grew up on Pacific Street in the Prospect Heights neighborhood of Brooklyn.  During the time period relevant to this lawsuit, Mr. Stewart resided at his childhood home on Pacific Street in Brooklyn.  Mr. Stewart is African-American.  Mr. Stewart participated in the PATP.  Prior to his participation in the PATP, Mr. Stewart had already successfully completed a 15-month construction industry pre-apprenticeship program.

## Defendants

15.     Defendant Atlantic Yards Development Company, LLC is a Delaware limited liability company formed on June 23, 2006.  Defendant Atlantic Yards Development Company, LLC has an office at c/o Forest City Ratner Companies, One Metrotech Center North, Brooklyn, New York 11201.  At all relevant times, Atlantic Yards Development Co., LLC was, and continues to be, "an enterprise engaged in commerce" within the meaning of the FLSA.

16.     Defendant Brooklyn Arena LLC is a Delaware limited liability company formed on November 12, 2004.  Defendant Brooklyn Arena LLC has an office at c/o Forest City Ratner Companies, One Metrotech Center North, Brooklyn, New York 11201. At all relevant times, Brooklyn Arena LLC was, and continues to be, "an enterprise engaged in commerce" within the meaning of the FLSA.

17.     Defendant Brooklyn United for Innovative Local Development ("BUILD") is a not-for-profit corporation formed on August 30, 2004, and organized under the laws of the State of New York.  BUILD is located at 485 Hudson Avenue, Brooklyn, New York 11217.

18.     Defendant James Caldwell is the Chief Executive Officer of BUILD.  At all relevant times, James Caldwell had power over personnel decisions in the PATP, including the power to hire and fire, establish and pay wages, establish work schedules, and maintain records.

19.     Defendant Forest City Ratner Companies LLC ("FCRC") is a New York limited liability company formed on November 6, 2006 and organized under the laws of the State of New York.  FCRC has offices located at One MetroTech Center, Brooklyn, New York 11201.  At all relevant times FCRC was, and continues to be, "an enterprise engaged in commerce" within the meaning of the FLSA.

20.     Defendant Forest City Enterprises, Inc. ("FCE") is a publicly traded real estate company headquartered in Cleveland, Ohio and incorporated under the laws of Ohio. FCE common stock is listed on the New York Stock Exchange.  At all relevant times FCE was, and continues to be, "an enterprise engaged in commerce" within the meaning of the FLSA.

21.     Defendant Gausia Jones is the owner of Orbin's Big Green Machine Construction and Remodeling Inc.  Defendant Jones supervised the PATP participants in their work on Staten Island.  At all relevant times, Gausia Jones had power over personnel decisions in the PATP, including the power to hire and fire, establish and pay wages, establish work schedules, and maintain records.

22.     Defendant Jane Marshall is the Senior Vice President of Commercial and Residential Development of Defendant Forest City Ratner Companies, LLC and at Defendant Forest City Enterprises, Inc.  At all relevant times, Jane Marshall had power over personnel decisions in the PATP, including the power to hire and fire, establish and pay wages, establish work schedules, and maintain records.

23.     Upon information and belief, Defendant Orbin's Big Green Machine is an unincorporated construction and remodeling business located at 365 Waverly Avenue Brooklyn, New York 11238.

24.     Defendant Bruce Ratner is chairman and Chief Executive Officer of Forest City Ratner Companies LLC, the New York City subsidiary of Forest City Enterprises, Inc.  He is also a member of the board of directors of Forest City Enterprises.   At all relevant times, Bruce Ratner had power over personnel decisions at the Atlantic Yards Development Co. LLC, Brooklyn Arena LLC, and Forest City Ratner Companies, including the power to hire and fire, establish and pay wages, establish work schedules, and maintain records.

25.     Defendants Atlantic Yards Development Company LLC, Brooklyn Arena LLC, Forest City Ratner Companies, Forest City Enterprises, Inc., Jane Marshall and Bruce Ratner are hereinafter referred to, collectively, as "the Developers."  At all times

relevant to this action, the Developers, BUILD, and Orbin's Big Green Machine operated as a joint integrated enterprise. These Defendants operated as a single integrated enterprise, with common offices (or offices in buildings owned by co-defendants), shared equipment, centralized control of labor relations and personnel management, and centralized financial control.

## APPLICABLE STATUTES

26.    Congress passed the Fair Labor Standards Act ("FLSA") in 1938 in order to protect workers from substandard wages, oppressive working hours, and labor conditions detrimental to the maintenance of a minimum standard of living. The statute has both remedial and humanitarian purposes designed to protect human dignity.

27.    At the heart of the FLSA are provisions requiring employers to pay a minimum wage and setting overtime pay rates. 29 U.S.C. § 206. Since July 25, 2008, the minimum wage has been set at $7.25 per hour. The FLSA also requires that employers pay their employees one and a half times the hourly rate of pay for any hours worked in excess of 40 hours per week.

28.    The FLSA provides a private cause of action for individuals whose employers violate the wage and hour provisions of the FLSA. Specifically, such employers are liable to their employees for any unpaid wages or unpaid overtime compensation. In addition, employers are liable to pay an additional equal amount in liquidated damages to uncompensated or undercompensated employees.

29.    The New York Labor Law's minimum wage and overtime provisions were enacted to eliminate the condition of uncompensated or undercompensated work. In passing the minimum and overtime wage provisions, the New York Legislature

emphasized that uncompensated labor harms workers and endangers the well-being of society as a whole. NYLL § 650.  The Legislature found:

> There are persons employed in some occupations in the state of New York at wages insufficient to provide adequate maintenance for themselves and their families. Such employment impairs the health, efficiency, and well-being of the persons so employed, constitutes unfair competition against other employers and their employees, threatens the stability of industry, reduces the purchasing power of employees, and requires, in many instances, that wages be supplemented by the payment of public moneys for relief or other public and private assistance. Employment of persons at these insufficient rates of pay threatens the health and well-being of the people of this state and injures the overall economy.

30.    New York keys its minimum wage provisions to the standard announced in the FLSA.  Thus, the minimum wage in New York is currently $7.25 per hour.  Likewise, New York mirrors the federal guidelines for overtime compensation.  New York frames its labor laws in terms of a full day's work.  Thus, overtime compensation must be provided for hours worked in excess of eight hours in a day.

31.    The New York State Legislature enacted the Consumer Protection Act – Article 22A of the General Business Law – to protect consumers from injuries caused by deceptive acts and practices. General Business Law § 349.

32.    Section 349 prohibits covered entities from engaging in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  General Business Law § 349(a).  The statute applies broadly to "all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state."  General Business Law § 349(g).

33.    "Any person who has been injured" by the deceptive acts and practices covered by the statute can bring an action to "recover his actual damages."  General Business Law § 349(h).

## FACTS

### <u>The Atlantic Yards Project</u>

34.     In December 2003, Bruce Ratner announced the Atlantic Yards Project ("the Project" or "AYP").  As initially announced, the development would have been the largest single-source development in New York City history.  According to the Developers, the Project was to occupy twenty-two acres in Prospect Heights, Brooklyn, and was to include an 18,000-seat arena and sixteen skyscrapers with residential and commercial space.

35.     In the seven and a half years since the AYP was announced the Developers' plans have become more modest, and the number of buildings to be constructed is likely to be significantly fewer than the sixteen originally planned.  At present, the arena for the New Jersey Nets ("the Arena") is being constructed at the corner of Atlantic and Flatbush Avenues.

36.     The announcement of the Project immediately provoked opposition from residents of the surrounding neighborhoods, in part because the Project required the demolition of many existing buildings and the dislocation of numerous tenants, homeowners, and local businesses.

37.     In order to make the Project more palatable, the Developers made a number of claims and promises.  Among the more notable of these was the Developers' promise that the Project would bring upwards of ten thousand jobs to Brooklyn.  In a flyer mailed to thousands of Brooklyn homes in 2004, the Developers claimed that no less than 10,000 permanent jobs and 15,000 construction jobs would be created by the project.  The same and similar claims were made in official documents, press releases, and other documents, including a March 11, 2010, press release in which FCRC and related entities claimed that

8,000 permanent jobs and 17,000 union construction jobs would be created. The promise of large-scale job creation was a major selling point to community members and politicians.

### The Community Benefits Agreement

38.     As a part of the Developers' attempts to assuage residents and win the support of local politicians who still had doubts about the Project, the Developers entered into what they called a "Community Benefits Agreement" ("CBA"), promising to provide certain benefits to the community. The CBA was negotiated primarily with organizations that had not actually existed prior to the Project's announcement, including Defendant BUILD. In fact, many of the organizations that ultimately signed the CBA were recipients of funding from the Developers or were bankrolled entirely by the Developers. Indeed, six of the eight organizations that signed the CBA had been created at the same time as the Project, and received money from the Developers during the process. Thus, the Developers were negotiating with entities of their own creation.

39.     While the organizations that signed the CBA at least existed as entities when the agreement was executed, Defendant Atlantic Yards Development Company LLC, designated as the "Project Developer" in the CBA, did not. The CBA was executed by Bruce Ratner on behalf of a then fictional entity called "Atlantic Yards Development Co. LLC, a New York limited liability company, having an office at c/o Forest City Ratner Companies," as of June 27, 2005. According to the records of the New York State Department of State, however, Atlantic Yards Development Company, LLC, a Delaware LLC, was not created until almost a year later, on June 23, 2006. Atlantic Yards

Development Company LLC's alleged parent company, Forest City Ratner Companies, LLC, was not created until even later, on November 6, 2006.

40.    In the CBA, the Developers promise, among other things, to create the PATP.  This program was to be created by the Developers and BUILD, in order to "train Community residents for construction jobs within the Arena and Project."  The CBA refers to "the Developers" (a term defined to include Defendants Atlantic Yards Development Co., LLC and Brooklyn Arena LLC) and BUILD several times as the entities responsible for initiating, coordinating, enrolling residents, and securing funding for the PATP:

> Commencing upon execution of this Agreement, Developers and BUILD shall initiate and coordinate a job training program to train Community residents for construction jobs within the Arena and Project. . . .

> The Developers and BUILD shall make every effort to enroll Community residents according to the priority specified in Section IV, Part A(2) . . . .

> The Developers and BUILD will seek and secure adequate public and/or private funding for this initiative.

41.    The CBA additionally states that "Developers shall assist BUILD in finding suitable space within the Community to operate this program."  Further, the CBA announces that Defendant Atlantic Yards Development Co., LLC "will meet and confer with BUILD regarding providing reasonable space for the duration of the initiative, but [Atlantic Yards Development Co. LLC] may decide in its sole and absolute discretion on the terms it would be willing to provide such space."  The CBA thus lays out a mechanism by which the Developers exert control over the conditions of employment for participants in the PATP, including the space where participants work, the enrollment of participants, and the funding to pay participants.

42.     The CBA also provides that the Developers can terminate the agreement by paying signatories a certain amount of money.

43.     The CBA requires the selection of an Independent Compliance Monitor ("ICM") to ensure that the Developers comply with the CBA, "[a]s soon as reasonably practicable after formation of the Executive Committee."

44.     The CBA establishes the following as a criterion of evaluation for the success of the PATP: "The Developers will prepare and submit to the coalition and the ICM a status report which . . . shall include . . . number of Community residents presently enrolled in the Pre Apprentice Training initiative; Community Boards in which they reside and percentage of Minority (by category) and women workers; household income; number who successfully completed such initiative, and number who obtained jobs at the Project Site; successful participants length of current employment at the Project Site; percentage of successful participants as to number of total apprentices at Project Site. . . ."

45.     The CBA places primary responsibility for the PATP on the Developers.  For example, the CBA states that if one of the Developers "has not adequately fulfilled its obligations under this initiative, such Developer shall pay to the Executive Committee, as liquidated damages for such failure, in accordance with Section XIII, Part C below, the sum of $500,000 to be used by BUILD to fund the Pre-Apprentice Training initiative."

46.     Despite the directive in the CBA, to date, no ICM has been selected.  As a consequence, there is currently no oversight or means of enforcement of the CBA.

47.     The CBA specifies that the Developers "intend to negotiate with the NYC Building Trades Council ("Trades Council") to enter into a Project Labor Agreement ("PLA") for the Arena and the Project to provide for uniformity of wages and benefits and

to promote employment of Community residents." The CBA goes on to specify that "[i]t is the intention of the Developers that the Trades Council will accept workers from the Pre-Apprentice Training initiative into the Trade Council's apprentice program."

### Brooklyn United for Innovative Local Development

48.     Under the CBA, BUILD is the entity responsible for "workforce development – including job development and training, placement, retention, and advancement initiatives."

49.     On its website, BUILD describes itself as "an organization committed to supporting development as a means of creating economic opportunities to promote financial self-sufficiency and prosperity in socio-economically depressed communities."

50.     BUILD was created in 2004 with money from FCRC.  On December 20, 2004, BUILD represented to the Internal Revenue Service that it expected to receive $2,524,000.00 in 2005 and $2,524,000.00 in 2006 from FCRC in the form of direct contributions.  Defendant Caldwell's salary, along with any other salaries that BUILD paid, were to be drawn from these funds.

51.     On October 14, 2005, the New York Times reported that "two months after the [CBA] was signed, Forest City disbursed $100,000 to the group.  The company also provided space for and is paying the overhead of a new Build office near the Atlantic Yards site." The Times based its reporting on statements made by Joe DePlasco, of Dan Klores Communications, a company hired by the Developers to manage publicity for the AYP.

52.     For tax years 2005, 2006, 2008, and 2009, BUILD represented to the IRS that its main office was located at 640 Pacific Street, Brooklyn, New York. This building is owned by a subsidiary of Forest City Ratner Companies, Brooklyn Arena Sub A LLC.

53.     For tax year 2007, and according to its current website, BUILD represented to the IRS that its main office was located at 485 Hudson Avenue, Brooklyn, New York. This property is owned by a subsidiary of Forest City Ratner Companies LLC, 625 Fulton Associates LLC.

54.     BUILD convened its first community meeting on January 29, 2004. Eleven days later, BUILD held a press conference to announce "community support for the Nets Arena and Atlantic Yards Development Project." Eleven days after this, BUILD testified at Borough Hall in support of the Atlantic Yards Project. BUILD was supportive of the Project from its creation and was essentially created to see the Project into fruition.

## Recruitment for the Pre-Apprentice Training Program

55.     In July 2010, BUILD began recruitment for the PATP. Chantal Desdunes, a BUILD employee, sent recruitment letters to individuals on BUILD's mailing list. The letter stated: "After many years of delay, we are preparing to launch a pilot of the Pre-Apprentice Training Program for people interested in training for employment in the construction building trades." The letter invited recipients to attend an information session on August 4, 2010 at St. Theresa of Avila Roman Catholic Church in Brooklyn.

56.     The August 4 information session was attended by hundreds of prospective participants, including many of the Plaintiffs. Not long after the information session, prospective participants were invited to take an aptitude test to determine if they were

eligible for the PATP.  Again, hundreds of people showed up, this time to take the PATP test.

57.     People who passed the PATP test were invited to an orientation session, which most Plaintiffs attended.  BUILD employees Chantel Lewis and Chantal Desdunes, BUILD Chief Executive Officer James Caldwell, and BUILD Chief Operations Officer Marie Louis were present at the orientation session.  At the session, Caldwell told the attendees that the PATP was "the opportunity of a lifetime," and promised that at the end of the PATP, they would each get a job at the Atlantic Yards Construction Site (AYCS).  He further promised them membership in one of the primary unions at the site, namely the laborers' union, the electricians' union, and the carpenters' union.  Caldwell told the attendees that, in light of the wages paid to unionized construction workers, they should "prepare to be millionaires."  Chantel Lewis and Marie Louis echoed Caldwell's promises that participants would be given union cards upon completion of the PATP.

58.     Some prospective participants in the PATP spoke with Caldwell individually before enrolling in the PATP.  One of those meeting with Caldwell was Ms. Noreiga.  During their conversation, Caldwell reiterated the promise that had been made to all the PATP participants before they joined the program, namely union jobs at the AYCS, and assured her that she would be among those given such a job. Mr. Griffin also met with Caldwell.  When Mr. Griffin asked Caldwell if he would need to apply for union membership after completing the PATP, Caldwell responded: "you do not have to apply to a union.  There are thirty construction books reserved for graduates of this class."  Mr. Stewart did not attend the orientation session, but when he spoke with Caldwell soon afterwards, Caldwell told Mr. Stewart, "We can get you a job."

59.     At the orientation session, Caldwell referred repeatedly to the Developers. For instance, Caldwell told the prospective participants that they would receive hands-on training at a worksite provided by the Developers.  Caldwell also referred to the PATP as his "baby" and stated that "Bruce knows this is my baby."  Plaintiffs understood "Bruce" to be a reference to Defendant Ratner.

60.     Defendant Jane Marshall, the Senior Vice President of Commercial and Residential Development of Forest City Enterprises, Inc. as well as Forest City Ratner Companies LLC, also attended the orientation session and represented to the prospective participants that the Project would provide construction work for ten years.  Defendant Marshall echoed Defendant Caldwell's promises that PATP participants would get union jobs at the AYCS upon completion of the program.  When asked about union cards, Marshall promised Plaintiff Griffin that he would be entitled to a union card upon completion of the project.

61.     After attending the orientation session, Plaintiffs decided to participate in the PATP.  Plaintiff Armstrong decided to participate because he wanted to join the ironworkers' union, and believed, based on the representation of Caldwell and other employees of BUILD and the Developers, that the PATP would allow him to join the ironworkers' union.  Plaintiff Noreiga decided to participate because she had regularly attended BUILD meetings, events, and rallies since 2004, and believed the promises of jobs and union memberships made by Caldwell and others from BUILD and the Developers.  Plaintiff Noreiga believed that the PATP would help lift her out of poverty.

62.     Several Plaintiffs quit jobs in order to participate in the PATP, because of Caldwell's, BUILD's, and Marshall's promises that they would receive union cards upon

completion of the PATP.  For instance, Mr. Griffin had work as a carpenter through Tradesource, but he quit his work in order to participate in the PATP so that he could gain admittance to a union.  Mr. Prime turned down a job offer for a position in building maintenance because Caldwell and others represented to him that if he enrolled in the PATP he would be guaranteed a high-paying union job at the end.  Mr. Stewart quit a job doing maintenance work in order to participate in the PATP so that he could gain admittance to a union.

63.  The unemployment rate in Kings County is 9.6% – the third highest of New York State's sixty-two counties.  Studies have found that the unemployment rate is markedly higher among young African-American men than the general number would suggest.  In 2010, in New York–Newark–Bridgeport, NY–NJ–CT–PA Combined Statistical Area, the mean hourly wage for union construction work was $37.15 whereas that for nonunion construction work was only $24.09 – a full $13.00 per hour more, or 54% more pay per hour, for workers in unions.

64.  Plaintiffs reasonably relied on the representations of BUILD and the Developers, as well as their officers and employees, regarding future employment and future induction into a union.  Their reliance was founded on promises made explicitly in the CBA and on public statements made by officers of the Developers and public figures endorsing the Atlantic Yards project.  In its description of the PATP, the CBA promises that "commencing upon execution of this Agreement, Developers and BUILD shall initiate and coordinate a job training program to train community residents for construction jobs within the Arena and Project . . . ."  The CBA then commits the Developers to securing a partnership with various construction unions that will provide union access to PATP

18

participants: the "Developers intend to negotiate with the NYC Building Trades Council ("Trades Council") to enter into a Project Labor Agreement ("PLA") for the Arena and the Project to provide for uniformity of wages and benefits and to promote employment of Community residents. It is the intention of the Developers that the Trades Council will accept workers from the Pre-Apprentice Training initiative into the Trades Council's apprentice program." After the CBA was signed, Bruce Ratner and Mayor Michael Bloomberg held a press conference at which Ratner stated, "It [the CBA] is legally binding. . . . It has in some cases economic penalties, it has mediation, as well as the ability of community groups to litigate and get an orderable injunction, and we hope to see the goals fulfilled, and if we don't, litigation can be used." In order to underscore the import of the CBA, Mayor Bloomberg interrupted Ratner to assert that "I would add something else — even more importantly, you have Bruce Ratner's word." Both the explicit promises in the CBA and public statements made by Bruce Ratner and Michael Bloomberg provide a firm foundation on which Plaintiffs developed reasonable expectations that their participation in the PATP would result in their gaining admission to a construction union.

65.     Caldwell repeatedly told Plaintiffs that they could rely on his promises and promises made by employees and officers of BUILD and the Developers, because they were subject to the legally binding requirements of the CBA. Caldwell often pointed to a poster, prominently displayed in the BUILD offices, that showed the signature page of the CBA. He relied on this as a visual aid when telling PATP participants that they could rely on his promises of union membership.

**The Pre-Apprentice Training Program**

19

66.     Not long after the orientation session, the PATP began.  Each morning, participants in the PATP were expected to arrive by 7 a.m.  At first, the PATP was taught in a classroom.  Classrooms were located at the BUILD offices at 485 Hudson Avenue in Brooklyn and also at 1 Metrotech Center, a building owned by FCRC.  Class ended each day around 2:30 p.m.

67.     Each day, PATP participants attended a "life skills" class, taught using The Seven Habits of Highly Effective People by Stephen R. Covey, as its primary textbook. PATP participants also attended basic lectures about construction techniques.  The participants were given handouts, but the materials were general and not sufficiently detailed to provide participants with new skills or knowledge.  The handouts included printouts from websites, such as Wikipedia, and photocopies of textbooks.

68.     Even after they had enrolled in the PATP, participants were repeatedly told that "everyone in the room will be millionaires."  One instructor, Greg Tyner, explained that participants could expect to earn $100,000 in annual income as unionized construction workers. One instructor told Mr. Griffin that he would earn an hourly rate of $45 upon completion of the program.  Another instructor told Ms. Noreiga that she could expect at least ten to fifteen years of construction work at the AYCS.

69.     PATP participants were required to wear and/or carry a uniform of construction boots, jeans, gloves, hardhats, goggles, and safety masks.  They were not reimbursed for the money they spent to acquire these supplies.

70.     There were three instructors in the PATP: Gausia Jones, Kevin Whittaker, and Greg Tyner.

71.    PATP participants were promised hands-on training. During the first month of training, when participants asked Caldwell when they could expect to begin the hands-on training, Caldwell responded: "Bruce has to provide us with a site." Caldwell represented to PATP participants that he was "fighting to get you a site." Caldwell also represented to PATP participants that he was waiting for funds from the Developers that would enable him to pay for the use of a hands-on training site.

72.    During the beginning weeks of the PATP, Caldwell and others who worked for BUILD and the Developers continued promising participants that upon completion of the PATP, they would be given membership cards for the union to which they preferred to belong. Caldwell and BUILD employees encouraged PATP participants to decide which union they would most like to be a part of, and represented that PATP participants would be able to choose which union they joined. Mr. Armstrong told Caldwell, as well as Jones, that he wanted to join the ironworkers' union. Jones promised Plaintiff Armstrong that he would be admitted. Caldwell told Mr. Armstrong: "I know what you want. I will get you your own book." Mr. Armstrong understood Caldwell to mean that he would ensure that Mr. Armstrong be admitted to membership in the ironworkers' union.

73.    Caldwell told the PATP participants that the union cards had been obtained by the Developers. Caldwell told the participants that FCRC was making the deals involved in getting the union books and that because BUILD was "under" FCRC, BUILD would benefit by getting the union books. Caldwell represented to Mr. Stewart that Caldwell and Ratner spoke regularly about the union cards and other matters relating to the PATP.

74.     While participating in the program, Mr. Silva received an invitation to attend an orientation for the laborers' union.  Mr. Silva told Chantel Lewis about the invitation. Chantel Lewis advised Mr. Silva not to attend, because he would soon be getting his union book through the program.  Based on this promise, Mr. Silva chose not to attend the orientation for the laborers' union.  He has not been contacted since by the laborers' union.

75.     Gausia Jones, an instructor at the PATP, repeatedly told PATP participants that he had seen the union cards and that they were ready to be given away upon completion of the PATP.  Caldwell told participants that he had seen 100 union books, 30 of which were reserved for participants in the PATP.

76.     During the program, Gausia Jones also handed out to each participant a flier that read:

> When I was a child, I spoke like a child; I thought like a child, I reasoned like a child.  When I became a man, I gave up childish things.
> 1 Corinthians 13:11
>
> When I was a non-union worker, I spoke like a non-union worker, I thought like a non-union worker, I behaved like a non-union worker. When I became a UNION WORKER, I put away all those things.
> Gausia Jones 2010

Plaintiffs understood this flier as encouragement and a reminder that when they finished the PATP, they would be union workers.

77.     By October 2010, it became apparent that Caldwell had been unable to secure a hands-on training site.  Jones owned a construction company, Orbin's Big Green Machine.  After the Developers failed to provide a site, PATP participants were told they would get their hands-on training at an Orbin's Big Green Machine worksite.  Caldwell told Mr. Stewart that Defendant Ratner had personally approved the use of Orbin's Big

Green Machine worksite.  The worksite that was selected was at a residential house on Staten Island that was being remodeled by Jones' company.  When the PATP participants arrived at the site, they learned that they were the only workers at this site.  Orbin's Big Green Machine did not employ any other workers at the site.  Instead, it was expected that PATP participants would do all debris removal and renovation at the Staten Island worksite.

78.   BUILD bought the materials that PATP participants used in their work at the Staten Island worksite.  Prior to beginning work at the worksite, Plaintiffs and other PATP participants were required to sign a waiver of liability, stipulating that they would not bring a lawsuit against BUILD or Jones if they were injured at the Staten Island worksite.

79.   At the Staten Island worksite, there was effectively no supervision.  Jones was present only intermittently at the worksite, and when he was present, he was the only supervisor for over thirty workers.  Jones checked in with the workers one to two times per week.  Jones often said: "The boss doesn't need to be there for you to get to work."

80.   The unpaid PATP participants were expected to perform heavy labor, including demolition.  They also removed debris, laid cinderblock walls to support the upper floor, poured cement floors, framed the rooms, installed plumbing, rewired the house, installed sheetrock, and laid tile for the bathroom.  The workers divided the work amongst themselves so that each was doing work that he or she already knew how to do.  For example, workers with experience doing electrical work installed the electrical system for the basement.

81.   When Gausia Jones did attempt to instruct the Plaintiffs and other PATP participants, he was unable to do so effectively, in large part because the workspace was so

small that only a few participants could see whatever task or action Jones was attempting to demonstrate.

82.    The worksite presented several safety hazards.  The house was shifting and was supported only by temporary braces.  There were cracks in the foundation walls and there were no posts in place to support the walls.  There was only one exit from the basement, and there were many people working in a very small space.  There was no work permit for the work being done by PATP participants.

83.    Jones often instructed the PATP participants to use shortcuts or to otherwise engage in bad workmanship.  For example, Jones provided them with two-by-four wooden beams, rather than metal posts, to use in the walls.  The cinderblock wall was not fully vertical because no plumb-line had been hung.

84.    PATP participants were told that working at the Staten Island worksite was compulsory if they wished to complete the PATP and receive their union cards.  PATP participants were not allowed to work until they signed the waiver releasing BUILD and Jones from liability in the event that they were injured on the worksite.

85.    FLSA Plaintiffs were not paid for the work they performed at the Staten Island worksite.  They were provided Metrocards by BUILD at about the seventh or eighth week of the PATP.  PATP participants were told by Caldwell that the Developers had finally given BUILD a check from which BUILD could purchase Metrocards and pay the teachers of the PATP.  PATP participants spent roughly two months at the Staten Island worksite.

86.    During the last few weeks of the program, staff from BUILD began to tell PATP participants that there were other pre-apprenticeship programs available to them.

24

BUILD staff informed the PATP participants that there were pre-apprenticeship programs for those who were under 30 years old, veterans, or women. BUILD staff said that anyone not eligible for another pre-apprenticeship program might be eligible for a position in maintenance at a building owned by FCRC.

87. At graduation, MaryAnne Gilmartin, Executive Vice President of Commercial and Residential Development at FCE and at FCRC, spoke to the PATP participants. She told them that they were still eligible for other pre-apprenticeships, but made no mention of membership in unions. At graduation, Caldwell spoke about the importance of BUILD's connection to the Developers, saying: "Bruce Ratner is an angel sent from God." Around the time of graduation, Caldwell informed members of the press that the Developers had committed to placing all PATP participants in jobs at buildings owned or controlled by the Developers.

88. Since graduation, only two of the Plaintiffs have been admitted to membership in a union. Both Mr. Armstrong and Mr. Griffin applied and gained admission to the carpenters union of their own initiative and without any assistance from BUILD.

89. Since graduation, none of the Plaintiffs has received an offer of employment in a construction job at the AYCS or from the Developers or from BUILD.

90. Many, if not most, of the PATP participants had backgrounds in construction before beginning the PATP. As a result, the Plaintiffs learned very little that they did not already know. For example, Mr. Prime was trained as a carpenter and had experience in sheet-rocking and framing. Ms. Noreiga was trained as an electrician prior to beginning

the PATP.  Mr. Stewart had experience as a plumber.  Mr. Griffin is an experienced carpenter.  Mr. Armstrong is a skilled carpenter and ironworker.

91.    In January 2011, Ms. Noreiga met with Caldwell to ask why there had been no offers of jobs or union membership.  Instead of answering her question, Caldwell encouraged her to join a pre-apprenticeship program for women interested in construction jobs.  Ms. Noreiga refused to do so.

92.    After graduation, Caldwell informed Mr. Griffin that temporary jobs doing political canvassing were available or that he could work for Planet Fitness for an hourly rate of $8.50.  In November 2011, Mr. Griffin was admitted to the carpenters' union after he applied without the help of Defendants.

93.    After graduation, Chantel Lewis offered Mr. Silva a job doing maintenance work for $12 per hour.  Mr. Silva declined the offer, stating that this was not the type of work he expected after completing the PATP.  Later, Chantel Lewis called Mr. Silva and told Mr. Silva that if he met with Ms. Noreiga and legal counsel to discuss bringing a lawsuit, BUILD would "blacklist" him from any union and any job in New York City.

94.    After graduation, Chantel Lewis offered Mr. Armstrong a job doing maintenance work for $12 per hour.  Mr. Armstrong declined the offer since he is a skilled laborer accustomed to making more than $12 per hour.  Chantel Lewis later called Mr. Armstrong to offer him a position in another pre-apprenticeship training program.  Mr. Armstrong also declined this offer.  Mr. Armstrong was admitted to the carpenters' union in July 2011, after he applied without the help of Defendants.

95.     After graduation, BUILD contacted Mr. Stewart about a maintenance job, but he was not offered the job.  BUILD also contacted Mr. Stewart about a job at a McDonald's restaurant.

96.     Mr. Prime was contacted by an unidentified employee of BUILD who invited him to go to the BUILD offices to see if there were jobs.

97.     Mr. Apple was contacted by BUILD in April 2011 regarding a job offer. When Mr. Apple met with Caldwell, no job was offered.  Instead Caldwell questioned Mr. Apple about possible litigation related to the PATP.

98.     As recently as November 3, 2011, in responding to questions at an Atlantic Yards District Service Cabinet Meeting, Defendant Marshall continued to assert that Defendants were connecting community members with union memberships.  She stated that BUILD has placed people in the "three sanctioned apprentice programs," and "they're getting their books."  She further stated that BUILD is now focusing on training people for retail rather than construction jobs.

### Collective Action

99.     This collective action is brought pursuant to 29 U.S.C. § 216(b), by the Plaintiffs, on behalf of themselves and all current or former PATP participants during the last three years, and who have given or will give their written consent to be plaintiffs herein pursuant to 29 U.S.C. § 216(b).

100.    Upon information and belief, there are many similarly situated former employees who have been denied minimum wages by Defendants in violation of FLSA.

101.    Those similarly situated former employees are known to Defendants and can be located through Defendants' records.

102.    These similarly situated former employees would benefit from the issuance of a Court-authorized notice of the present lawsuit and opportunity to join the present lawsuit.

103.    A collective action is superior to other methods for the fair and efficient adjudication of this controversy.  Upon information and belief, no litigation similar to this action is currently pending.  A collective action regarding the issues in this case creates no problems of manageability.

### FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS[1]
*Fair Labor Standards Act – Federal Minimum Wage Violations*

104.    FLSA Plaintiffs reallege and incorporate by reference all allegations in all preceding numbered paragraphs.

105.    Defendants willfully failed to pay FLSA Plaintiffs and others similarly situated the federally mandated minimum wage, in violation of the FLSA, 29 U.S.C. § 206(a)(1).

106.    At all relevant times, upon information and belief, Defendants were and continue to be employers engaged in commerce within the meaning of the FLSA, 29

---

[1] In a Memorandum and Order of this Court dated June 18, 2012, Defendants' partial motions to dismiss were granted with respect to (a) the fraudulent inducement claim; (b) the promissory estoppel claim only with respect to Defendants Ratner, Jones, and Orbin's Big Green Machine; (c) the breach of contract claims only with respect to Defendants Ratner, Caldwell, Marshall, Jones and Orbin's Big Green Machine; and (d) the unjust enrichment claim only with respect to Defendants Ratner, Marshall, Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, Forest City Enterprises, Inc., Forest City Ratner Companies, LLC, Caldwell, and BUILD. CM/ECF Document 38.  These claims have been removed from the Complaint to conform with the June 18, 2012 Memorandum and Order of this Court, but this deletion is not intended to be nor should it be construed as a waiver of those claims, all of which are reserved for appeal.

U.S.C. §§ 206(a) and 207(a).  Upon information and belief, at all relevant times, Defendants have had gross revenues in excess of $500,000.00.

107.    FLSA Plaintiffs were employees of Defendants.  FLSA Plaintiffs performed work benefiting Defendants.

108.    FLSA Plaintiffs received no payment for the hours they spent working for the Defendants.

109.    As a result of the foregoing, FLSA Plaintiffs, and others similarly situated, are entitled to recover from Defendants amounts to be proven at trial for unpaid minimum wages, an equal amount as liquidated damages, reasonable attorneys' fees, and costs of the action, pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
*New York Labor Law – State Minimum Wage Violations*

110.    Plaintiffs reallege and incorporate by reference all allegations in all preceding numbered paragraphs.

111.    Defendants willfully failed to pay Plaintiffs the New York State minimum wage for all hours worked, in violation of N.Y. Labor Law § 652.

112.    Plaintiffs were employees of Defendants.  Plaintiffs performed work benefiting Defendants.

113.    Plaintiffs received no payment for the hours they spent working for the Defendants.

114.    As a result of the foregoing, Plaintiffs are entitled to recover from Defendants amounts to be proven at trial for unpaid minimum wages, an equal amount as liquidated damages, prejudgment interest, reasonable attorneys' fees, and costs of the action, pursuant to N.Y. Labor Law § 663.

## THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
*Violation of New York General Business Law § 349*

115.    Plaintiffs reallege and incorporate by reference all allegations in all preceding numbered paragraphs.

116.    Defendants targeted low income, African-American Brooklyn residents, and through various deceptive acts and practices, in violation of §349 of the General Business Law, induced them to participate in the PATP and perform unpaid manual labor in hazardous conditions.

117.    Defendants repeatedly misrepresented to Plaintiffs, in conversations, individual meetings and trainings, that they would receive union cards and union jobs upon the completion of the program.

118.    As a result of the Defendants' deceptive practices, the Plaintiffs in some instances were induced to leave paying jobs, and in others, to forgo opportunities for employment.

119.    A reasonable person could have easily relied on the statements and promises made by Defendants.

120.    As a result of the foregoing, Plaintiffs are entitled to recover from Defendants amounts to be proven at trial for actual damages, treble damages, and attorneys' fees.

121.    As a result of the foregoing, Plaintiffs seek an order enjoining Defendants from repeating their deceptive practices.

### FOURTH CAUSE OF ACTION AGAINST DEFENDANTS ATLANTIC YARDS DEVELOPMENT COMPANY, LLC, BROOKLYN ARENA LLC, BUILD, FCRC, AND FCE
*Breach of Contract*

122.   Plaintiffs reallege and incorporate by reference all allegations in all preceding numbered paragraphs.

123.   Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, FCRC, and FCE repeatedly promised each individual Plaintiff membership in the union of his or her choice and employment at the AYCS in exchange for the Plaintiffs' agreement to participate in and complete the PATP.  Plaintiffs' agreement and subsequent work performed constituted valuable consideration.

124.   In response to this offer, Plaintiffs agreed to attend required classes and perform work for Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, FCRC, and FCE as PATP participants.

125.   Plaintiffs attended the required classes and performed work for Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, FCRC, and FCE as PATP participants.

126.   Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, FCRC, and FCE failed and refused to provide Plaintiffs with the promised union memberships and have not offered AYCS jobs to the Plaintiffs, thereby breaching a contract formed by said Defendants' offer and Plaintiffs' acceptance.

127.   As a result of the foregoing, Plaintiffs are entitled to recover from Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, FCRC, and FCE amounts to be proven at trial for compensatory damages.

**FIFTH CAUSE OF ACTION AGAINST**
**DEFENDANTS ATLANTIC YARDS DEVELOPMENT COMPANY, LLC,**
**BROOKLYN ARENA LLC, BUILD, FCRC, AND FCE**
*Breach of Unilateral Contract*

128.   Plaintiffs reallege and incorporate by reference all allegations in all preceding numbered paragraphs.

129.   Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, FCRC, and FCE repeatedly promised each individual Plaintiff membership in the union of his or her choice upon completion of the PATP and employment at the AYCS.

130.   Plaintiffs, in reasonable reliance on this promise, attended required classes and performed work for Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, FCRC, and FCE, thus completing performance of the unilateral contract.

131.   Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, FCRC, and FCE failed and refused to provide Plaintiffs with the promised union memberships and have not offered AYCS jobs to the Plaintiffs, thereby breaching a unilateral contract formed by said Defendants' offer and Plaintiffs' performance.

132.   As a result of the foregoing, Plaintiffs are entitled to recover from Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, FCRC, and FCE amounts to be proven at trial for compensatory damages.

**SIXTH CAUSE OF ACTION AGAINST DEFENDANTS ATLANTIC YARDS**
**DEVELOPMENT COMPANY, LLC, BROOKLYN ARENA LLC, BUILD, JAMES**
**CALDWELL, FCRC, FCE AND JANE MARSHALL**
*Promissory Estoppel*

133.   Plaintiffs reallege and incorporate by reference all allegations in all

preceding numbered paragraphs.

134.    Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, James Caldwell, FCRC, FCE and Jane Marshall repeatedly promised each individual Plaintiff membership in the union of his or her choice upon completion of the PATP.

135.    In reasonable reliance on this promise, Plaintiff Griffin left his job and forewent present income in order to participate in the PATP.

136.    In reasonable reliance on this promise, Plaintiff Stewart did not pursue other offers of employment in order to participate in the PATP.

137.    All Plaintiffs forewent pursuit of alternative employment in reasonable reliance on this promise.

138.    All Plaintiffs paid for a portion of travel expenses to and from Staten Island in reasonable reliance on this promise.

139.    All Plaintiffs purchased and supplied their own work clothes in order to work at the Staten Island site.

140.    In reasonable reliance on clear promises made by Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, James Caldwell, FCRC, FCE and Jane Marshall, Plaintiffs suffered damages.

141.    As a result of the foregoing, Plaintiffs are entitled to recover from Defendants Atlantic Yards Development Company, LLC, Brooklyn Arena LLC, BUILD, James Caldwell, FCRC, FCE and Jane Marshall amounts to be proven at trial for compensatory damages.

## SEVENTH CAUSE OF ACTION AGAINST
## DEFENDANTS GAUSIA JONES AND ORBIN'S BIG GREEN MACHINE
### *Unjust Enrichment*

142.     Plaintiffs reallege and incorporate by reference all allegations in all preceding numbered paragraphs.

143.     Plaintiffs rendered services as construction workers in good faith.

144.     Defendants Gausia Jones and Orbin's Big Green Machine accepted those services and in turn failed to compensate Plaintiffs for the reasonable and/or fair market value of their services.

145.     Defendants Gausia Jones and Orbin's Big Green Machine have benefited from these services at Plaintiffs' expense.

146.     Defendants Gausia Jones and Orbin's Big Green Machine consciously or recklessly disregarded the rights of Plaintiffs.

147.     As a result of the foregoing, Plaintiffs are entitled to recover from Defendants Gausia Jones and Orbin's Big Green Machine amounts to be proven at trial for compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants as follows:

(i)     That at the earliest possible time, Plaintiffs be allowed to give notice of this collective action, or that the Court issue such notice, to all persons who are presently, or have at any time during the three years immediately preceding the filing of this action, up through and including the date of this Court's issuance of Court-authorized notice, been employed by Defendants.  Such notice shall inform them that this civil action

34

has been filed, of the nature of the action, and of their right to join this action if they believe they were denied proper hourly compensation;

(ii)    In favor of FLSA Plaintiffs and similarly situated current and former employees of Defendants for unpaid minimum wages under the FLSA and an equal amount as liquidated damages, pursuant to 29 U.S.C. § 216;

(iii)    In favor of Plaintiffs for unpaid minimum wages under the New York Minimum Wage Act regulations, and an equal amount as liquidated damages, pursuant to N.Y. Labor Law § 663(1);

(iv)    In favor of Plaintiffs for actual damages and treble damages pursuant to N.Y. Gen. Bus. Law § 349 (h);

(v)    In favor of Plaintiffs for permanent injunctions for the Defendants' unlawful deceptive practices, pursuant to N.Y. Gen. Bus. Law § 349 (h);

(vi)    In favor of Plaintiffs for compensatory damages for breach of the unilateral contract;

(vii)    In favor of Plaintiffs for compensatory damages under the doctrine of promissory estoppel;

(viii)   Punitive damages;

(ix)    Prejudgment and postjudgment interest;

(x)    Reasonable attorneys' fees, together with the costs and disbursements of this action; and

(xi)    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a

trial by jury in this action.


Dated: Brooklyn, New York
      April 11, 2013

SOUTH BROOKLYN LEGAL
SERVICES

Sarah E. Dranoff
Nicole Salk
Gary Steven Stone
Latanya White
105 Court Street, 4th Floor
Brooklyn, NY 11201
718-237-5500


EMERY CELLI BRINCKERHOFF &
ABADY LLP
Matthew D. Brinckerhoff
Jennifer M. Keighley
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

*Counsel for Plaintiffs*
